IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

In re

                              Case No. 12-30049

WILLIAM STANLEY REED
DEBBIE ELAINE REED

        Debtors

**MEMORANDUM ON OBJECTION TO CLAIM OF**
**FIRST TENNESSEE BANK NATIONAL ASSOCIATION**

**APPEARANCES:**    GRIBBLE CARPENTER & ASSOCIATES
                           Keith L. Edmiston, Esq.
                           118 Parliament Drive
                           Knoxville, Tennessee  37804
                           Attorneys for Debtors

                         BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
                         Richard B. Gossett, Esq.
                         Summer H. McMillan, Esq.
                         265 Brookview Centre Way
                         Suite 600
                         Knoxville, Tennessee  37919
                         Attorneys for First Tennessee Bank National Association

                         GWENDOLYN M. KERNEY, ESQ.
                         Post Office Box 228
                         Knoxville, Tennessee  37901
                         Chapter 13 Trustee

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the court on the Objection of Debtor to Claim of First Tennessee Bank National Association (Objection to Claim) filed by the Debtors on August 15, 2012, seeking an order disallowing the unsecured claim filed by First Tennessee Bank National Association (First Tennessee Bank) on January 20, 2012, in the amount of $18,824.71.  First Tennessee Bank filed the Response in Opposition to Objection of Debtor to Claim of First Tennessee Bank National Association (Response) on August 31, 2012.  Following a hearing and pursuant to an Order entered on November 6, 2012, the parties agreed that an evidentiary hearing was not required and that all matters in controversy could be resolved upon stipulations and briefs.

The parties filed a Joint Stipulation of Facts and Documents Relevant to Resolution of the Objection of Debtors to Claim of First Tennessee Bank National Association, along with eight stipulated exhibits, on November 30, 2012.  On December 21, 2012, First Tennessee Bank filed the Brief of First Tennessee Bank National Association in Support of Response to Objection of Debtor to Claim, and the Debtors filed the Brief of Debtors in Support of Objection of Debtors to Claim of First Tennessee Bank National Association on January 17, 2013.  Thereafter, the Response of First Tennessee Bank National Association to Brief of Debtors in Support of Objection to Claim and the Reply of Debtors to Brief of First Tennessee National Association in Support of Response to Objection of Debtors to Claim were filed on January 24, 2013, by First Tennessee Bank and the Debtors, respectively.

# I

On July 12, 2008, the Debtors executed a Promissory Note in the principal amount of $304,000.00, representing loan number 30029011, in favor of First Tennessee Bank which was secured by a Deed of Trust pledging as collateral real property located at 6203 Chapman Highway, Knoxville, Tennessee (Chapman Highway Property). JT. STIPS. at ¶¶ 2-3, 5; COLL. EX. 1; EX. 2. Both the Promissory Note and the Deed of Trust contain provisions providing for payment of First Tennessee Bank's attorneys' fees, expenses, and costs in the event of default. JT. STIPS. at ¶¶ 6-7; COLL. EX. 1; EX. 2.

The Debtors defaulted under the terms of the Promissory Note, and on May 25, 2010, First Tennessee Bank foreclosed its lien on the Chapman Highway Property. JT. STIPS. at ¶ 8. At that time, as reflected on the Form 1099-A issued by First Tennessee Bank to the Internal Revenue Service, the Chapman Highway Property had a market value of $262,500.00, and the outstanding principal balance of the Debtors' loan was $267,574.18. JT. STIPS. at ¶ 9; COLL. EX. 3. First Tennessee Bank also filed with the Internal Revenue Service, and sent to the Debtors, a Form 1099-C "Cancellation of Debt," which states that the remaining principal amount due and owing on the Debtors' loan with First Tennessee Bank, $5,074.18, was "cancelled" on June 24, 2010. JT. STIPS. at ¶¶ 10-11, 14; COLL. EX. 3. Based upon the Form 1099-C, the Debtors included on Line 21 in the Income section of their Form 1040 Individual Income Tax Return for 2010 "other income" in the amount of $5,074.00 as "cancelled debt income." JT. STIPS. at ¶¶ 12-13; COLL. EX. 4.

On April 8, 2011, First Tennessee Bank filed a lawsuit against the Debtors in the Chancery Court for Blount County, Tennessee, seeking to recover $12,075.17, representing the $5,074.18 principal balance and interest due under the Promissory Note after foreclosure, plus attorneys' fees and collection costs. JT. STIPS. at ¶ 15; EX. 5. Upon the Debtors' failure to respond, First Tennessee Bank filed a Motion for Default Judgment on November 15, 2011, at which time the principal and interest had increased to $12,306.74 and attorneys' fees and collection costs totaled $6,729.03. JT. STIPS. at ¶¶ 16-17; EX. 6.

The Debtors filed the Voluntary Petition commencing their Chapter 13 bankruptcy case on January 5, 2012, the day before the hearing on First Tennessee Bank's Motion for Default Judgment in the Blount County Chancery Court, and on January 9, 2012, First Tennessee Bank filed a Notice of Voluntary Dismissal of the lawsuit. JT. STIPS. at ¶ 17; EX. 7; EX. 8. First Tennessee Bank filed a Proof of Claim in the Debtors' bankruptcy case on January 20, 2012, in the amount of $18,824.71, representing principal and interest in the amount of $11,772.32, attorneys' fees and collection costs in the amount of $6,729.03, accrued interest from January 26, 2011 through January 6, 2012, in the amount of $323.36, and interest as it continues to accrue from January 6, 2012, at a rate of $0.94 per diem, in accordance with the Promissory Note. JT. STIPS. at ¶ 18; COLL. EX. 1. The Debtors filed their Objection to Claim on August 15, 2012, to which First Tennessee Bank filed its Response on August 31, 2012. On November 6, 2012, the court entered a scheduling Order defining the issue as whether the Form 1099-C filed by First Tennessee Bank constitutes an admission by First Tennessee Bank that the debt it is owed by the Debtors under the Promissory Note was cancelled or discharged such that First Tennessee Bank is estopped from enforcing its debt against the Debtors.

**II**

A proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes prima facie evidence as to the claim's validity and amount and is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a) (2006); FED. R. BANKR. P. 3001(f). A claim's validity first stems from the status as a creditor of the debtor, which is defined by the Bankruptcy Code as "[an] entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[,]" 11 U.S.C. § 101(10)(A) (2006), whereas "claim" is defined as:

> (A) [the] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) [the] right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5) (2006). In the event of an objection, the objecting party must present evidence rebutting the proof of claim by refuting at least one allegation that is essential to the legal sufficiency of the claim, after which the burden of proof shifts to the claimant to prove the claim's validity by a preponderance of the evidence. *In re Cleveland*, 349 B.R. 522, 527 (Bankr. E.D. Tenn. 2006) (citation omitted). In this case, the parties do not dispute that the Debtors executed a Promissory Note in favor of First Tennessee Bank secured by the Chapman Highway Property, that the Debtors defaulted under the terms of the Promissory Note, that First Tennessee Bank foreclosed its lien and sold the Chapman Highway Property, and that there was a deficiency balance following the sale. The dispute is based solely upon whether the Form 1099-C "Cancellation of Debt" issued to the Internal Revenue Service which required the Debtors to list the $5,074.18 "cancelled debt income"

as part of gross income on their 2010 Form 1040 Individual Income Tax Return constituted a cancellation or discharge of the deficiency balance such that the Debtors no longer owe any obligation to First Tennessee Bank under the Promissory Note, thus necessitating a disallowance of First Tennessee Bank's Proof of Claim.

The relevant section of the Internal Revenue Code is 26 U.S.C. § 6050P, entitled "Returns relating to the cancellation of indebtedness by certain entities," which provides:

> **(a) In general.** Any applicable entity which discharges (in whole or in part) the indebtedness of any person during any calendar year shall make a return (at such time and in such form as the Secretary may by regulations prescribe) setting forth—
>
>> **(1)** the name, address, and TIN of each person whose indebtedness was discharged during such calendar year,
>>
>> **(2)** the date of the discharge and the amount of the indebtedness discharged, and
>>
>> **(3)** such other information as the Secretary may prescribe.
>
> **(b) Exception.** Subsection (a) shall not apply to any discharge of less than $600.
>
> **(c) Definitions and special rules.** For purposes of this section—
>
>> **(1) Applicable entity.** The term "applicable entity" means—
>>
>>> **(A)** an executive, judicial, or legislative agency (as defined in section 3701(a)(4) of title 31, United States Code), and
>>>
>>> **(B)** an applicable financial entity.
>>
>> **(2) Applicable financial entity.** The term "applicable financial entity" means—
>>
>>> **(A)** any financial institution described in section 581 or 591(a) [26 USCS § 581 or 591(a)] and any credit union,

**(B)** the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the National Credit Union Administration, and any other Federal executive agency (as defined in section 6050M [26 USCS § 6050M]), and any successor or subunit of any of the foregoing,

**(C)** any other corporation which is a direct or indirect subsidiary of an entity referred to in subparagraph (A) but only if, by virtue of being affiliated with such entity, such other corporation is subject to supervision and examination by a Federal or State agency which regulates entities referred to in subparagraph (A), and

**(D)** any organization a significant trade or business of which is the lending of money.

**(3) Governmental units.** In the case of an entity described in paragraph (1)(A) or (2)(B), any return under this section shall be made by the officer or employee appropriately designated for the purpose of making such return.

**(d) Statements to be furnished to persons with respect to whom information is required to be furnished.** Every applicable entity required to make a return under subsection (a) shall furnish to each person whose name is required to be set forth in such return a written statement showing—

**(1)** the name and address of the entity required to make such return, and

**(2)** the information required to be shown on the return with respect to such person.

The written statement required under the preceding sentence shall be furnished to the person on or before January 31 of the year following the calendar year for which the return under subsection (a) was made.

**(e) Alternative procedure.** In lieu of making a return required under subsection (a), an agency described in subsection (c)(1)(A) may submit to the Secretary (at such time and in such form as the Secretary may by regulations prescribe) information sufficient for the Secretary to complete such a return on behalf of such agency. Upon receipt of such information, the Secretary shall complete such return and provide a copy of such return to such agency.

26 U.S.C. § 6050P (2006). This statute must also be read in tandem with 26 C.F.R. § 1.6050P-1,

which provides, in material part:

**(a) Reporting requirement—(1) In general.** Except as provided in paragraph (d) of this section, any applicable entity (as defined in section 6050P(c)(1)) that discharges an indebtedness of any person (within the meaning of section 7701(a)(1)) of at least $600 during a calendar year must file an information return on Form 1099–C with the Internal Revenue Service. Solely for purposes of the reporting requirements of section 6050P and this section, a discharge of indebtedness is deemed to have occurred, except as provided in paragraph (b)(3) of this section, if and only if there has occurred an identifiable event described in paragraph (b)(2) of this section, whether or not an actual discharge of indebtedness has occurred on or before the date on which the identifiable event has occurred. The return must include the following information—

>   **(i)** The name, address, and taxpayer identification number (TIN), as defined in section 7701(a)(41), of each person for which there was an identifiable event during the calendar year;
>
>   **(ii)** The date on which the identifiable event occurred, as described in paragraph (b) of this section;
>
>   **(iii)** The amount of indebtedness discharged, as described in paragraph (c) of this section;
>
>   **(iv)** An indication whether the identifiable event was a discharge of indebtedness in a bankruptcy, if known; and
>
>   **(v)** Any other information required by Form 1099–C or its instructions, or current revenue procedures.

   **(2) No aggregation.** For purposes of reporting under this section, multiple discharges of indebtedness of less than $600 are not required to be aggregated unless such separate discharges are pursuant to a plan to evade the reporting requirements of this section.

   **(3) Amounts not includible in income.** Except as otherwise provided in this section, discharged indebtedness must be reported regardless of whether the debtor is subject to tax on the discharged debt under sections 61 and 108 or otherwise by applicable law.

   . . . .

**(b) Date of discharge—(1) In general.** Solely for purposes of this section, except as provided in paragraph (b)(3) of this section, indebtedness is discharged on the date of the occurrence of an identifiable event specified in paragraph (b)(2) of this section.

8

**(2) Identifiable events—(i) In general.** An identifiable event is—

(A) A discharge of indebtedness under title 11 of the United States Code (bankruptcy);

(B) A cancellation or extinguishment of an indebtedness that renders a debt unenforceable in a receivership, foreclosure, or similar proceeding in a federal or State court, as described in section 368(a)(3)(A)(ii) (other than a discharge described in paragraph (b)(2)(i)(A) of this section);

(C) A cancellation or extinguishment of an indebtedness upon the expiration of the statute of limitations for collection of an indebtedness, subject to the limitations described in paragraph (b)(2)(ii) of this section, or upon the expiration of a statutory period for filing a claim or commencing a deficiency judgment proceeding;

(D) A cancellation or extinguishment of an indebtedness pursuant to an election of foreclosure remedies by a creditor that statutorily extinguishes or bars the creditor's right to pursue collection of the indebtedness;

(E) A cancellation or extinguishment of an indebtedness that renders a debt unenforceable pursuant to a probate or similar proceeding;

(F) A discharge of indebtedness pursuant to an agreement between an applicable entity and a debtor to discharge indebtedness at less than full consideration; [or]

(G) A discharge of indebtedness pursuant to a decision by the creditor, or the application of a defined policy of the creditor, to discontinue collection activity and discharge debt[.][[1]]

. . . .

**(iii) Decision to discontinue collection activity; creditor's defined policy.** For purposes of the identifiable event described in paragraph (b)(2)(i)(G) of this section, a creditor's defined policy includes both a written policy of the creditor and the creditor's established business practice. Thus, for example,

---

[1] Subsections (b)(2)(i)(H) and (b)(2)(iv) concern a non-payment testing period consisting of a minimum of 36 months, increased by any months during which a creditor is precluded from engaging in collection activity due to bankruptcy or other applicable law, and has no bearing on the court's determination.

>a creditor's established practice to discontinue collection activity and abandon debts upon expiration of a particular non-payment period is considered a defined policy for purposes of paragraph (b)(2)(i)(G) of this section.
>
>. . . .
>
>**(3) Permitted reporting.** If a discharge of indebtedness occurs before the date on which an identifiable event occurs, the discharge may, at the creditor's discretion, be reported under this section.
>
>**(c) Indebtedness.** For purposes of this section and § 1.6050P–2, indebtedness means any amount owed to an applicable entity, including stated principal, fees, stated interest, penalties, administrative costs and fines. The amount of indebtedness discharged may represent all, or only a part, of the total amount owed to the applicable entity.
>
>**(d) Exceptions from reporting requirement—** . . . .
>
>. . . .
>
>**(2) Interest.** The discharge of an amount of indebtedness that is interest is not required to be reported under this section.
>
>**(3) Non-principal amounts in lending transactions.** In the case of a lending transaction, the discharge of an amount other than stated principal is not required to be reported under this section. For this purpose, a lending transaction is any transaction in which a lender loans money to, or makes advances on behalf of, a borrower (including revolving credits and lines of credit).
>
>. . . .

26 C.F.R. § 1.6050P-1 (2013). Information provided on a Form 1099-C includes the name, street address, and telephone number of the creditor, the creditor's federal identification number, the name and street address of the debtor, the debtor's identification or social security number, an account number, the amount of the cancelled debt, the amount of any interest included within the amount of the cancelled debt, the date it was cancelled, a description of the debt, whether or not the debtor was personally liable for repayment of the debt, whether the debtor is in bankruptcy, and the fair market

10

value of the property. *See, e.g.*, COLL. EX. 3. "[A] Form 1099-C allows the IRS to compare the amount of the discharged debt claimed by a lending institution with the amount of income reported by the person whose debt was discharged." *Cavoto v. Hayes*, 634 F.3d 921, 923 (7th Cir. 2011).

As an initial matter, a number of courts have held that "[t]he issuance of a Form 1099-C does not, alone, operate to extinguish a debt." *Atchison v. Hiway Fed. Credit Union*, 2013 WL 1175020, at *3, 2013 U.S. Dist. LEXIS 38532, at *8 (D. Minn. Mar. 20, 2013); *see also FDIC v. Cashion*, 2012 WL 1098619, at *7, 2012 U.S. Dist. LEXIS 45843, at *19 (W.D.N.C. Apr. 2, 2012) ("[A] Form 1099-C [which "is issued to comply with IRS reporting requirements"] does not itself operate to legally discharge a debtor's liability."); *Carrington Mortg. Servs., Inc. v. Riley*, 478 B.R. 736, 744 (Bankr. D.S.C. 2012) (stating that the debtors' credit report and Form 1099-C received from the lender were "not dispositive, and there is no evidence that the note has been satisfied."); *In re Sarno*, 463 B.R. 163, 168 (Bankr. D. Mass. 2011) ("It is apparent . . . that a form 1099-C is 'informational' and that it must be filed 'whether or not an actual discharge of indebtedness has occurred.'") (citations omitted). In fact, the United States District Court for the Eastern District of Tennessee has stated that "a Form 1099-C, as a matter of law, does not operate to legally discharge a debtor from liability on a claim that is described in the form." *United States v. Reed*, 2010 WL 3656001, at *2, 2010 U.S. Dist. LEXIS 96079 at *5 (E.D. Tenn. Sept. 14, 2010).

Additionally, citing to and relying upon an information letter from the Internal Revenue Service dated December 30, 2005, courts have found that "[t]he IRS itself does not view a Form 1099-C as an admission that the creditor has discharged the debt and can no longer pursue collection thereon." *Cashion*, 2012 WL 1098619, at *7, 2012 U.S. Dist. LEXIS 45843, at *20

11

(citing IRS Ltr. Rul. 2005-0207, 2005 WL 3561135 (Dec. 30, 2005)); *see also Capital One, N.A. v. Massey*, 2011 WL 3299934, at *3, 2011 U.S. Dist. LEXIS 83817, at *10 (S.D. Tex. Aug. 2, 2011) (citing the letter and stating that "a 1099-C is issued to comply with IRS reporting requirements."). The information letter, written in 2005, was addressed to a company "in the business of purchasing debts in large pools at a significant discount" in answer to its "request [for] information concerning the reporting obligations under section 6050P(c)(2)(D) for an organization that purchases debt." IRS Ltr. Rul. 2005-0207, 2005 WL 3561135. With respect to the issue presently in dispute, the letter states the following:

> To briefly address your concerns about whether courts may view the filing of a Form 1099-C as a written admission that the creditor discharged the debt, and that debtors would be less willing to pay after your organization files a Form 1099-C, you should note the following. The Internal Revenue Service does not view a Form 1099-C as an admission by the creditor that it has discharged the debt and can no longer pursue collection. Section 1.6050P-1(a) of the regulations provides that, solely for purposes of reporting cancellation of indebtedness, a discharge of indebtedness is deemed to occur when an identifiable event occurs whether or not an actual discharge of indebtedness has occurred on or before the date of the identifiable event.

IRS Ltr. Rul. 2005-0207, 2005 WL 3561135. It is supplemented by another information letter, also dated December 30, 2005, containing the following question and answer:

> Q5. Does filing a Form 1099-C upon the occurrence of an identifiable event prohibit future collection activity on the amount reported?
>
> A5. Section 1.6050P-1(a)(1) of the regulations provides that solely for purposes of the reporting requirements of section 6050P of the Code, a discharge of indebtedness is deemed to have occurred upon the occurrence of an identifiable event whether or not there is an actual discharge of indebtedness. Section 6050P and the regulations do not prohibit collection activity after a creditor reports by filing a Form 1099-C.

IRS Ltr. Rul. 2005-0208, 2005 WL 3561136. Each letter, both of which were written by Donna Welch, Senior Counsel, Administrative Provisions & Judicial Practice (Procedure &

12

Administration), also expressly states that it "calls your attention to certain general principles of the law. It is intended for informational purposes only and does not constitute a ruling." IRS Ltr. Rul. 2005-0207, 2005 WL 3561135; IRS Ltr. Rul. 2005-0208, 2005 WL 3561136.

Although the court generally agrees with the basic assessment that the Internal Revenue Service requires financial institutions to issue a Form 1099-C as a reporting requirement, the court disagrees that the information letters are determinative as to the issue here, finding that the language of the Regulation itself is open to interpretation. On the one side, the court recognizes that the Internal Revenue Service's interpretation of the Code of Federal Regulations may be entitled to deference, as directed by the Supreme Court:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
>
> "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S. Ct. 1055, 1072, 39 L. Ed. 2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44, 104 S. Ct. 2778, 2781-82, 81 L. Ed.2d 694 (1984) (footnotes omitted); *see also Bononi v. Bayer Emps. Credit Union*

13

*(In re Zilka)*, 407 B.R. 684, 688 (Bankr. W.D. Pa. 2009). Nevertheless, an agency's interpretation of what Congress intended is only entitled to deference when "a statute is ambiguous, and if the implementing agency's construction is reasonable, . . . even if the agency's reading differs from what the court believes is the best statutory interpretation[,]" *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980, 125 S. Ct. 2688, 2699, 162 L. Ed.2d 820 (2005), and "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference. Instead interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944), but only to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662, 146 L. Ed.2d 621 (2000) (citations omitted).

In this case, the court is not persuaded by the two information letters relied upon by other courts. It cannot be discounted that the Internal Revenue Service's interpretation relied upon by First Tennessee Bank and other courts, which is based entirely upon statements within the foregoing information letters concerning how the Internal Revenue Service views a Form 1099-C, is in direct conflict with the Internal Revenue Code and the fact that cancellation of indebtedness income is included within a debtor's gross income. *See* 26 U.S.C. § 61(a)(12).

> "Gross income" is defined in the Internal Revenue Code as "all income from whatever source derived..." It includes income from discharge of indebtedness, or cancellation of indebtedness (COD income). This means that a taxpayer who has incurred a financial obligation, which obligation is later discharged or the taxpayer is released from the indebtedness, has realized an accession to income. The rationale

>of this principle is that the discharge of a debt below the face value of the debt accords the debtor an economic benefit equivalent to income.

*Friedman v. Comm'r*, 216 F.3d 537, 545 (6th Cir. 2000) (citing 26 U.S.C. § 61(a)(12)) (citations omitted). "Cancellation-of-Debt or 'COD' is a term that is interchangeable with the term discharge of indebtedness." *Alpert v. United States*, 430 F. Supp. 2d 682, 684 n.1 (N.D. Ohio 2006). "[I]n order for COD income to occur under [§] 61(a)(12), the taxpayer must have been discharged from a liability." *Friedman*, 216 F.3d at 546. "Debt is considered discharged the moment it is clear that it will not be repaid. Determining when this moment occurs requires an assessment of the facts and circumstances surrounding the likelihood of repayment. Any identifiable event which fixes the loss with certainty may be taken into consideration." *Sims v. Comm'r*, 2002 WL 1825373, at *1, 2002 Tax Ct. Summary LEXIS 78, at *3 (U.S. Tax Ct. June 26, 2002) (citations and quotations omitted).

>It is well settled that gross income includes income from the discharge of indebtedness. Sec. 61(a)(12). The general theory is that to the extent that a taxpayer has been released from indebtedness, he has realized an accession to income because the cancellation effects a freeing of assets previously offset by the liability arising from such indebtedness. *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931). Whether a debt has been discharged is dependent on the substance of the transactions. Mere formalisms arranged by the parties are not binding in the application of the tax laws. *Comm'r v. Court Holding Co.*, 324 U.S. 331 (1945). Consequently, the surrender or failure to surrender a note is not determinative of the release of liability. *Seay v. Comm'r*, T. C. Memo. 1974-305.
>
>The moment it becomes clear that a debt will never have to be paid, such debt must be viewed as having been discharged. The test for determining such moment requires a practical assessment of the facts and circumstances relating to the likelihood of payment. *Brountas v. Comm'r*, 74 T.C. 1062, 1074 (1980), supplemental opinion to 73 T.C. 491 (1979), *vacated and remanded on other grounds* 692 F.2d 152 (1st Cir. 1982), *aff'd in part and rev'd in part on other grounds sub nom. CRC Corp. v. Comm'r*, 693 F.2d 281 (3d Cir. 1982); *see Bickerstaff v. Comm'r*, 128 F.2d 366, 367 (5th Cir. 1942); *Kent Homes Inc. v. Comm'r*, 55 T.C. 820, 828-831 (1971), *rev'd on other grounds* 455 F.2d 316 (10th Cir. 1972); *Cotton v. Comm'r*, 25 B.T.A. 1158 (1932). Any "identifiable event"

15

which fixes the loss with certainty may be taken into consideration. *United States v. S.S. White Dental Mfg. Co.,* 274 U.S. 398 (1927).

*Cozzi v. Comm'r*, 88 T.C. 435, 445 (1987); *see also Friedman*, 216 F.3d at 546 (quoting *Cozzi*, 88 T.C. at 445); *Kleber v. Comm'r*, 2011 WL 4485037, at *3, 2011 Tax Ct. Memo LEXIS 228, at *6-7 (U.S. Tax Ct. Sept. 28, 2011) (same); *Rinehart v. Comm'r*, 2002 WL 459098, at *2, 2002 Tax Ct. Memo LEXIS 75, at *6 (U.S. Tax Ct. Mar. 26, 2002) (same).

Because it is not reasonable in light of its conflict with sections of the United States Code, the court does not agree that the Internal Revenue Service's interpretation that the filing of a Form 1099-C does not prohibit further collection of an indebtedness against a debtor is entitled to deference when a debtor has, as required by the Internal Revenue Code, relied upon the Form 1099-C and included the discharged or cancelled debt in gross income for the purpose of determining the debtor's taxable income. It is inequitable to require a debtor to claim cancellation of debt income as a component of his or her gross income and subsequently pay taxes on it while still allowing the creditor, who has reported to the Internal Revenue Service and the debtor that the indebtedness was cancelled or discharged, to then collect it from the debtor.[2] Cancellation of debt income is not required to be reported to the Internal Revenue Service unless one of the express "identifiable events" occurs, so it seems to follow that if a financial institution has filed a Form 1099-C with the Internal Revenue Service, cancellation or discharge of a debt has, in fact, occurred. The court does

---

[2] It appears that financial institutions play both sides with respect to the filing of a Form 1099-C. In this case, First Tennessee Bank argues that a Form 1099-C is filed merely to comply with the Internal Revenue Service's reporting requirements. However, when required to defend against allegations that it violated the Fair Debt Collection Practices Act, Capital One, N.A. argued that "the issuance of an IRS Form 1099-C is not an attempt to collect a debt; instead, it is a declaration under penalty of perjury that the debt has been cancelled and that Defendant would never attempt to collect the debt." *Dues v. Capital One, N.A.*, 2011 WL 3799762, at *5, 2011 U.S. Dist. LEXIS 96435, at *13 (E.D. Mich. Aug. 8, 2011).

not agree with the argument that because a Form 1099-C can be corrected or amended, it cannot constitute an admission by a creditor that a debt has, in fact, been discharged or cancelled and that the debtor is no longer indebted thereon. *See Zilka*, 407 B.R. at 689.

Here, it is undisputed that the Debtors relied upon the Form 1099-C and included the $5,074.18 unpaid principal balance in their gross income for 2010. As stated by the Bankruptcy Court for the District of Kansas,

> The Credit Union's filing of the 1099-C's was analogous to assigning the debts to the IRS, necessarily passing to the IRS any right to collect money from the debtors on account of the debts. Without the forms, the debtors would not have had to report the discharge of indebtedness income to the IRS and pay tax on it, as Ms. Crosby, at least, claims she did. Even if the debtors did not report the income and pay the tax, or reported it and claimed an exclusion under 26 U.S.C.A. § 108(a)(1), the IRS could audit their returns and, because of the 1099-C's, possibly impose additional tax and penalties. The actual (or at least potential) tax consequences of the form make it inequitable to allow the Credit Union to enforce its claims against the debtors. Until the Credit Union corrects or withdraws the 1099-C it mistakenly filed about each debtor, it cannot enforce its claim against that debtor, just as it would have no right to do so if it had assigned the debt and not undone the assignment.

*In re Crosby*, 261 B.R. 470, 474 (Bankr. D. Kan. 2001). This sentiment was also cited with approval by the United States Bankruptcy Court for the Eastern District of Pennsylvania, which found that the prima facie validity of a Proof of Claim filed by Citifinancial had been rebutted by proof that Citifinancial had filed and served upon the debtor a Form 1099-C and that the debtor had then listed as other income and paid taxes on that amount. *In re Welsh*, 2006 WL 3859233, at *1-2, 2006 Bankr. LEXIS 3756, at *3-4, 8 (Bankr. E.D. Pa. Oct. 27, 2006). The *Welsh* court agreed that "[i]t would be inequitable . . . to require that [the debtor-defendant] report the discharge of debt as income on his federal tax return or face the potential tax consequences and hold that the plaintiff may continue to hold him liable on the debt." *Welsh*, 2006 WL 3859233, at *2, 2006 Bankr. LEXIS

17

3756, at *6 (quoting *Franklin Mgmt. Corp. v. Nicholas*, 2001 WL 893894, at *4, 2001 Conn. Super. LEXIS 1908, at *13 (Conn. Super. July 12, 2001)).

This court agrees with the United States District Court's decision in *Reed* and with the other courts holding that the issuance of a 1099-C by a financial institution does not, as a matter of law, operate to extinguish an indebtedness. Instead, the court determines that the issuance of a Form 1099-C *reflects* that a financial institution has, in accordance with 26 U.S.C. § 6050P and 26 C.F.R. § 1.6050P-1, discharged an indebtedness, which must then be reported by the debtor as taxable income. The statute requires the filing of a return by an entity "which discharges (in whole or in part) the indebtedness of any person during any calendar year[.]" 26 U.S.C. § 6050P(a). It is supplemented by the Regulation which requires the entity to "file an information return on Form 1099-C." 26 C.F.R. § 1.6050P-1(a)(1). The actions described as "identifiable events" in 26 C.F.R. § 1.6050P-1 – consisting of discharge in a bankruptcy case, extinguishment of an indebtedness through foreclosure on similar federal or state court proceeding, the expiration of a statute of limitations, the imposition of an election or remedies/statutory bar against collection, discharge in a probate action, an accord and satisfaction between the parties, and a creditor's defined policy or determination to discharge the debt – reflect the intention that cancellation of indebtedness income must be based upon an event that does, in fact, relieve a debtor from his or her obligation to pay the indebtedness. The results of that discharge or extinguishment are then to be reported to the Internal Revenue Service and the debtor by way of the Form 1099-C. Once again, it is not the issuance of the Form 1099-C that operates to discharge the debt; the issuance of the Form 1099-C

Case 3:12-bk-30049-SHB    Doc 81    Filed 05/14/13    Entered 05/14/13 14:34:58    Desc
Main Document      Page 19 of 20

merely reflects that the financial institution has discharged or cancelled the debt, which then becomes taxable income to the debtor.

Accordingly, the $5,074.18 reflected on the Form 1099-C issued by First Tennessee Bank to the Debtors, which represented the principal balance owing on the July 12, 2008 Promissory Note following foreclosure of the Chapman Highway Property, was discharged or cancelled, such that the Debtors would no longer be indebted to First Tennessee Bank for that amount. The court is aware that it has adopted the minority view; however, in the interests of justice and equity, the court believes that this is the proper view.[3]

The same cannot, however, be said for any interest, collection costs, or attorneys' fees due and owing to First Tennessee Bank under the Promissory Note through June 24, 2010, the date upon which the underlying debt was cancelled. Those amounts are not required by 26 U.S.C. § 6050P or 26 C.F.R. § 1.6050P-1 to be reported, and it can easily be discerned that any such fees or charges that were incurred but not collected prior to the cancellation or discharge of the underlying indebtedness would still be due and owing to the creditor. The parties have stipulated that interest continued to accrue at a rate of $0.94 per diem. As reflected in Exhibit A to the Proof of Claim, as of January 25, 2011, principal and interest totaled $11,772.32. Subtracting the $5,074.18 reflected on the Form 1099-C yields interest in the amount of $6,698.14. This figure must also be reduced by

---

[3] Additionally, the facts in *Reed* can be distinguished from those presently before the court. In that case, after making an initial statement that a Form 1099-C does not, as a matter of law, operate to discharge an indebtedness, the court found that the Form 1099-C had been filed by the Business Loan Center for an obligation that was owed to the Small Business Administration and that "BLC had no authority to forgive the portion of the debt incurred by SBA[,]" which was "85% of the $25,000 loan." *Reed*, 2010 WL 3656001, at *3, 2010 U.S. Dist. LEXIS 96079, at *6. Furthermore, the Small Business Administration was the present owner and holder of the note and had, on two separate occasions, made a written demand for payment upon the defendant in that case after issuance of the Form 1099-C. *Reed*, 2010 WL 3656001, at *2, 2010 U.S. Dist. LEXIS 96079, at *5.

$202.10, representing the $0.94 per diem amount multiplied by the days between June 25, 2010 and January 25, 2011, i.e, the 215 days included within First Tennessee Bank's figure subsequent to the June 24, 2010 cancellation of the debt.  Accordingly, the Debtors are still indebted to First Tennessee Bank in the amount of $6,496.04 for the interest due under the Promissory Note as of June 24, 2010. Also, the Debtors remain indebted to First Tennessee Bank for its costs and attorneys' fees owing to June 24, 2010.  First Tennessee Bank is not, however, entitled to any fees or costs associated with collection of the Promissory Note subsequent to the June 24, 2010 cancellation of the underlying debt.  Because the $6,729.03 figure on Exhibit A to its Proof of Claim appears to include fees and costs incurred after that date, First Tennessee Bank's claim will be allowed in the amount of $6,496.04 plus costs and attorneys' fees incurred from May 25, 2010, the date the Chapman Highway Property was foreclosed, up to June 24, 2010.  To ensure the accuracy of First Tennessee Bank's claim, the court will direct that it file an amended claim within 14 days to include the $6,496.04 interest portion of its claim plus fees and costs incurred to June 24, 2010, with such fees and costs to be fully itemized.

An Order consistent with this Memorandum will be entered.

FILED:  May 14, 2013

                                             BY THE COURT

                                             */s/  RICHARD STAIR, JR.*

                                             RICHARD STAIR, JR.
                                           UNITED STATES BANKRUPTCY JUDGE